# United States District Court
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 4:15-CV-36 |
| | § | Judge Mazzant |
| | § | |
| COMMERCIAL RECOVERY SYSTEMS, INC., TIMOTHY L. FORD, individually and as an officer of COMMERCIAL RECOVERY SYSTEMS, INC., and DAVID J. DEVANY, individually and as a former officer of COMMERCIAL RECOVERY SYSTEMS, INC. | § § § § § § § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff's Motion for Summary Judgment (Dkt. #30). The Court, having considered the relevant pleadings, finds that Plaintiff's motion should be granted as to Defendants Commercial Recovery Systems, Inc. ("CRS") and Timothy Ford ("Ford").[1]

## BACKGROUND

On March 13, 2013, in response to numerous consumer complaints about CRS's debt collection practices, the Federal Trade Commission ("FTC") issued a Civil Investigative Demand ("CID") to CRS to review its debt collection practices. CRS's responses to the CID and FTC's interviews with former employees corroborated the numerous consumers' complaints. Based upon the evidence, Plaintiff the United States of America filed this suit, seeking both injunctive relief and civil penalties.

Defendant CRS is a Texas corporation that has been in business since 1994. Until 2013, its

---

[1] The Court defers ruling on Plaintiff's motion for summary judgment against Defendant David Devany.

main office was in Dallas, with a secondary office in Plano, Texas. CRS is a third-party debt collector that primarily collects consumer debt that was "primarily for personal, family, or household purposes," including auto loans and credit card debts, on behalf of the original creditors, and conducts business in numerous states. In November 2013, CRS sought bankruptcy protection under Chapter 11. Defendant Tim Ford, CRS's President, Director, and majority shareholder, testified in CRS's bankruptcy proceedings that the company's insolvency resulted, in large part, from a number of Fair Debt Collection Practices Act ("FDCPA") lawsuits brought by private litigants.

Defendant Ford has been CRS's Director and President since its incorporation. Until recently, he was also its sole shareholder. Ford drew a salary of up to $200,000 per month from the company until its bankruptcy. Ford spoke daily with the company's Vice President, David Devany, and received regular updates about the company, including updates about litigation, FDCPA issues, and consumer complaints. Ford also actively helped manage the company by authorizing the termination and discipline of employees and assisting with planning and providing incentive contests to award to top collectors. Ford approved settlements of lawsuits filed against the company, including lawsuits alleging FDCPA violations. Ford signed a February 2013 Stipulation and Final Agency Order, entered into between CRS and the Colorado Attorney General, to resolve multiple violations of the Colorado Fair Debt Collection Practices Act.

As a third-party collector, CRS did not own the debts it collected. The company was not a law firm and did not sue debtors or garnish wages. CRS was a mid-size debt collection company. Shortly before declaring bankruptcy, the company employed approximately 300 employees, but downsized in 2013 to employing approximately 80 collectors. CRS collectors earned a monthly base salary of between $1,500 and $3,000, depending upon the collector's skill level and production, and

earned commissions for amounts collected above quota. In addition to their base salary and commissions, top collectors received a variety of rewards such as access to CRS's luxury suite at AT&T Stadium to watch Dallas Cowboys' games or a lunch or dinner at an upscale local restaurant.

According to former employees, FDCPA compliance training at CRS was virtually nonexistent, and some collection groups were more FDCPA compliant than others. In written CID interrogatory responses, CRS noted that it administered an FDCPA compliance test to all new employees. However, some former employees do not remember any FDCPA training for new hires. According to them, newly hired employees were on the floor collecting the day they were hired.

CRS stated in its 2013 CID interrogatory responses that it had a full-time employee who monitored its collection calls for FDCPA compliance, noted all violations, and wrote up offending employees. But former employees contradict CRS's claims, describing that no formal disciplinary system for FDCPA violations existed at the company and that employees were rarely terminated for FDCPA violations. These former-employee allegations are supported by the number of violations identified in call recordings. Some former employees stated the only employees fired for FDCPA violations were those whose collection tactics resulted in complaints from the creditor-client or a lawsuit.

CRS's collection practices generated a large number of complaints filed with the Better Business Bureau. Numerous complaints reported that CRS collectors were: (1) falsely representing the character or legal status of a debt; (2) falsely representing or implying that Defendants' collectors were attorneys or that a communication was on behalf of an attorney; (3) falsely representing or implying that nonpayment of a debt would result in the filing of a lawsuit or other legal action against the consumer; and (4) falsely representing or implying that nonpayment of a debt would

result in the seizure, garnishment, or attachment of a person's property or wages. Consumers continued to file numerous complaints even after CRS received the FTC's CID in March 2013.

Part of CRS's response to the FTC's CID was the production of a hard drive containing audio recordings of thousands of calls made by CRS collectors between November 1, 2012, and March 21, 2013. Given the volume of recordings, FTC listened to a random sampling of 300 calls to determine whether the database contained any FDCPA violations. The best evidence of CRS's repeated abusive and deceptive collection tactics, discussed in detail below, is contained in those recordings.

The most common misrepresentation employed by CRS collectors is impersonating attorneys, attorneys' staff, or judicial employees. Of the 300 random calls analyzed, 77 included such impersonations. In these call recordings, collectors described themselves as attorneys or calling on behalf of attorneys or a law firm, such as by claiming that they were calling from "the Law Offices of CRS and Associates." Collectors implied that attorneys were involved in the collection efforts, by stating they were calling from "the legal department," or were calling regarding "a legal matter pending," that they "represented" CRS, or that they "represented the legal interests" of a creditor. Collectors told consumers that "there is a case against you" and offered to resolve it "out of court."

Collectors also claimed to be judicial employees, mediators, or other court personnel. One collector stated that he was a mediator working for a state judge, going so far as to put the consumer on hold while he pretended to speak with the judge regarding the consumer's case. Another stated that she was "with the county," calling regarding an "affidavit of complaint." In another call, a collector referred to himself as a "senior mediator for CRS and associates," which he proclaimed to be a "firm hired by Bank of America" to sue the consumer.

Former employees confirmed that such tactics were commonplace and were intended to pressure consumers into paying their accounts. One former employee stated that some collection groups ran a police scanner as background noise to make the collectors' threats, that a constable was on his way to serve the consumer with a lawsuit, sound real.

The audio recordings also demonstrate that CRS collectors frequently threatened consumers with litigation despite having no authority to sue on behalf of its creditor-clients. Collectors led consumers to believe that an action was already filed against the consumer and would continue unless the consumer paid the debt. These threats were patently false because, as CRS admitted, the company did not file lawsuits against debtors. Collectors in 68 of the 300 randomly selected call recordings expressly or impliedly threatened litigation. Collectors at times expressly threatened to bring litigation. Collectors frequently used terms that implied threatened legal action. Collectors claimed that an "affidavit of complaint" or "case" was filed against the consumer, and offered to settle it "out of court." Collectors also stated they would "proceed with action" unless the consumer returned the collector's call by a certain date or time. Collectors suggested that consumers' failure to return the voicemail would constitute "waiving [their] rights." Sometimes collectors gave a "case number" or referred to a "complaint" that has been filed in their office and stated that paying the debt now would prevent the case from going further. Former employee-collectors acknowledged that these types of threats about lawsuits were used regularly at CRS to induce payment.

In the audio recordings produced by CRS, CRS collectors falsely threatened to garnish wages. Twenty-one of the 300 randomly selected call recordings included threats of garnishment, seizure or attachment. These threats are patently false because, as CRS admitted, the company does not attempt to garnish consumer wages, place liens on consumer property, or otherwise take action

5

against debtors. Audio recordings produced by CRS featured collectors stating they were calling regarding a "writ of execution" or "execution of service" that had been or was being filed against the consumer. Collectors reminded debtors that wage garnishment was possible, or directly threatened to garnish wages. On one call, a collector explained the garnishment consequences that would result from failing to pay CRS:

> [Y]ou will be responsible for the court costs and attorney's fees. It does include a 25 percent wage garnishment, any accounts that are in your name, will be garnished, if you receive taxes they will be garnished, if you have 401k, it will be garnished until the judgment it is paid.

Former employees stated that false threats to garnish or seize assets were routinely used to pressure consumers into paying. In response to Interrogatory No.16 of the CID, CRS admitted, "CRS does not institute suits against consumers, nor does CRS attempt to garnish wages, place liens on consumer property, or otherwise take action against debtors."

On December 18, 2015, Plaintiff filed a motion for summary judgment against all defendants (Dkt. #30). No response was filed by CRS or Ford.

**LEGAL STANDARD**

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party

opposing the motion for summary judgment. *Casey Enterprises, Inc. v. American Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson,* 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News*, *Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257.

**ANALYSIS**

Plaintiff moves for summary judgment asserting that Defendants violated the FDCPA and the FTC Act.

The purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). The FDCPA restricts debt collectors from making false or misleading representations or using unfair collection methods. *Id.*; 15 U.S.C.

§§ 1692e, 1692f. Debt collectors must also provide certain written information concerning the debt collection. 15 U.S.C. § 1692g. Courts have generally referred to the FDCPA as a "strict-liability statute" that makes debt collectors liable even for inadvertent violations. *See Glover v. F.D.I.C.*, 698 F.3d 139, 149 (3d Cir. 2012).

The FDCPA sets forth a nonexclusive list of unlawful debt collection practices and provides for public enforcement by the FTC. In order to prevail on an FDCPA claim the government must demonstrate that the plaintiff has been the object of collection activity arising from consumer debt, and the defendants are debt collectors who engaged in acts or omissions prohibited by the FDCPA. *Fuller v. Becker & Poliakoff, P.A.*, 192 F. Supp. 2d 1361, 1366 (M.D. Fla. 2002). A single violation is sufficient to establish civil liability. *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2nd Cir. 1993); *see* 15 U.S.C. § 1692k(a); *Del Campo v. Am. Corrective Counseling Servs.*, 718 F. Supp. 2d 1116, 1132 (N.D. Cal. 2010); *Schwarm v. Craighead*, 552 F. Supp. 2d 1056, 1074 (E.D. Cal. 2008).

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce." An act or practice is deceptive under Section 5 if it involves a material representation or omission that is likely to mislead consumers, acting reasonably under the circumstances, to their detriment. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994); *In re Nat'l Credit Mgmt. Grp., L.L.C.*, 21 F. Supp. 2d 424, 441 (D.N.J. 1998).

Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act. An express claim unequivocally states the representation, which itself establishes the meaning of the claim, and no further evidence about the meaning is necessary. *In the Matter of Cliffdale Assocs, Inc.,* 103 FTC 110, 1984 WL 565319, at *46 (1984). Implied claims fall along a continuum, from those that are so conspicuous as to be "virtually

8

synonymous" with express claims to language that few consumers would interpret as making a particular representation. *In the Matter of Kraft, Inc.*, 114 F.T.C. 40, 1991 WL 11008502, at *58 (1991). "Explicit claims or deliberately-made implicit claims . .. are presumed to be material." *In re Nat'l Credit Mgmt. Grp., LLC.*, 21 F. Supp. 2d at 441.

Violations of the FDCPA are automatically violations of the FTC Act, because a violation of the FDCPA is deemed an unfair or deceptive act or practice in violation of the FTC Act. 15 U.S.C. § 1692*l*(a); *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich L.P.A.*, 559 U.S. 573, 577 (2010). Thus, for the purpose of Commission enforcement of the FDCPA, a violation of the FDCPA is deemed the legal equivalent of a violation of Section 5 of the FTC Act.

Where defendants have violated the FTC Act, the law provides for injunctive relief, 15 U.S.C. § 53(b). The FTC Act and the FDCPA provide for monetary civil penalties of up to $10,000 for each violation. 15 U.S.C. § 45(m)(1)(A), *see* 28 U.S.C. § 2461; *Jerman*, 559 U.S. at 577 (actual knowledge up to $16,000 per day).

**Debt Collectors under FDCPA**

Plaintiff first asserts that Defendants are debt collectors as defined by the FDCPA.

The FDCPA defines a "debt collector" as follows:

any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6). The Court finds that, based upon the summary judgment evidence, there can be no reasonable dispute that CRS has been engaged in the collection of debts, via interstate commerce (specifically, recorded telephone calls to multiple states), and thus, is a "debt collector"

9

under the law. Defendants CRS and Ford have admitted that the company is a debt collector for purposes of the FDCPA.

**Violations of FDCPA and FTC Act**

Plaintiff next asserts that Defendants have engaged in acts prohibited by the FDCPA and the FTC Act. Section 807 of the FDCPA prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. In addition to this general prohibition, the Act identifies specific conduct that is barred by the statute. Among other prohibitions, debt collectors may not: (1) falsely represent the character, amount, or legal status of any debt; (2) falsely represent or imply that an individual is an attorney, or that any communication is from an attorney; (3) represent or imply that nonpayment of a debt will result in seizure, garnishment, attachment or sale of property or wages, unless such action is permitted by law and the debt collector or creditor intends to take such an action; or (4) threaten to take any action that cannot legally be taken, or that the debt collector does not intend to take. 15 U.S.C. § 1692e (2)-(5).

The summary judgment evidence establishes that Defendants have violated the FDCPA in four specific ways. First, Section 807(3) of the FDCPA bars "the false representation or implication that any individual is an attorney or that any communication is from an attorney." 15 U.S.C. § 1692e(3). Defendants' collectors falsely represented that they were attorneys, or were employed by an attorney, law firm, or court. Defendants' collectors were not attorneys and did not work for attorneys. There was no attorney retained by CRS for the purpose of debt collection. The summary judgment evidence demonstrates that Defendants falsely represented or implied that their communications were from attorneys, in violation of Sections 807(3) of the FDCPA.

Section 807(5) of the FDCPA bars threats to take any action that cannot legally be taken or

is not intended to be taken. 15 U.S.C. § 1692e(5). It includes threats to file a suit when there is no intention to sue. *See id.* The summary judgment evidence establishes that Defendants' collectors routinely threatened consumers with legal action. Defendants did not file any civil lawsuits against consumers, and never intended to take any legal actions against the debtors with whom they communicated. Thus, their threats were patently false, and Defendants engaged in widespread violations of Section 807(5) of the FDCPA.

Section 807(4) of the FDCPA bars collectors from falsely representing or implying that nonpayment will result in a consumer's arrest, imprisonment, or the seizure or garnishment of a consumer's property or wages. 15 U.S.C. § 1692e(4). Representations that a consumer will be arrested or imprisoned, or that the consumer's property or wages will be seized or garnished, violate this section "unless such action is lawful and the debt collector or creditor intends to take such action." *Id.* The uncontested summary judgment evidence establishes that Defendants' collectors routinely misrepresented to consumers that nonpayment would result in seizure or garnishment of the consumer's property or wages. Defendants did not engage in garnishment or property attachment proceedings. Defendants had no intention of taking any of the legal actions their collectors threatened against consumers, and thus, their threats were false and violated Section 807(4) of the FDCPA.

Section 807(2) of the FDCPA bars collectors from falsely representing "the character, amount, or legal status of any debt" or "any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt." 15 U.S.C. § 1692e(2). Defendants' violations of Section 807(5) are also violations of Section 807(2). The uncontested summary judgment evidence establishes that by falsely representing to consumers that their debts were already taken to judgment, or were already the subject of active litigation, they also violated

Section 807(2) by falsely representing the legal status of the debt. Because the misrepresentations as to the character of consumers' debts were express, they are presumptively material; because the representations were false, they were deceptive, in violation of Section 807(2) of the FDCPA.

The uncontested summary judgment records establishes that CRS debt collectors repeatedly and routinely violated the FDCPA; and thus the FTC Act, in multiple ways, by making blatantly false representations for the purpose of intimidating consumers into paying debts. This pattern and practice of deceptive debt collection tactics occurred regularly over time and could continue into the future.

A violation of the FDCPA is deemed the legal equivalent of a violation of Section 5 of the FTC Act. 15 U.S.C. § 1692*l*(a); *Jerman*, 559 U.S. at 577. The FTC Act gives the government authority to seek injunctions to prevent violation of "any provision of law enforced" by the FTC. 15 U.S.C. § 53(b). Thus, if the Court finds that a corporate defendant violated any provision of law the FTC enforces, the Court has the authority to exercise its full equitable powers against it, including issuing permanent injunctive relief. *Pantron I Corp.*, 33 F.3d at 1102; *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 571 (7th Cir. 1989); *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1314-15 (8th Cir. 1991).

The summary judgment record is clear and it is uncontroverted that CRS is a debt collector covered by the FDCPA and that its collectors have committed numerous violations of the FDCPA and Section 5 of the FTC Act. Therefore, CRS is liable for injunctive relief under Section 5 of the FTC Act. CRS's collectors made numerous false statements, including false threats of imminent civil prosecution and impersonating attorneys or attorneys' employees, to induce consumers to pay money to Defendants. Based upon any one of the numerous violations proven, CRS is liable for

injunctive relief. Permanent injunctive relief remains available even when illegal conduct has ceased, if there is a possibility that it might reoccur. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). Although CRS has declared bankruptcy, the government does not seek civil penalties from the company, since CRS still maintains its corporate identity; therefore, regardless of any bankruptcy proceedings, CRS remains in a position to engage in abusive debt collection practices at any time. There remains a cognizable danger of recurrent violation, and injunctive relief remains appropriate.

**Individual Liability**

Plaintiff also moves for summary judgment against Ford for injunctive relief. To obtain an injunction against an individual, the government must show that the individual (1) directly participated in the violative acts, (2) played a role in controlling, directing, or formulating the policies and practices that resulted in violative acts, or (3) had the authority to control the unlawful activities or participated directly in them. *In re Nat'l Credit Mgmt. Grp., LLC*, 21 F. Supp. 2d at 461; *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996); *see also FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1234 (9th Cir. 1999). Courts have held that merely assuming the duties of a corporate officer is probative of an individual's authority to control. *Amy Travel*, 875 F.2d at 573; *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 538 (S.D.N.Y. 2000). This is especially true when the corporate defendants are small, closely held corporations. *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002); *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973).

Based upon the summary judgment evidence, the Court finds that Ford, as President and owner of CRS, not only played a role in formulating the policies and practices that resulted in the

13

violative acts, but in fact actually set the policies of his company. As the President, he had the authority to fire or otherwise discipline his employees for employing deceptive debt collection tactics. Because he failed to respond to Plaintiff's First Set of Discovery Requests to Defendant Ford, pursuant to Federal Rule Civil. Procedure 36(a)(3), he has now deemed to have admitted them. Thus, Ford has admitted that he was aware of complaints filed by consumers with the Better Business Bureau and the Federal Trade Commission regarding CRS collectors, that he participated in responding to FDCPA brought against CRS, and that he had the authority to control the debt collection practices of both CRS offices. Therefore, Ford, by virtue of his management positions and his day-to-day involvement in the company's operations, is subject to injunctive relief.

Plaintiff also moves for summary judgment asserting that Ford should be held liable for civil penalties. Pursuant to Section 5(m)(I)(A) of the FTC Act, as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d), the FTC is empowered to recover civil penalties from a defendant who violates the FDCPA with "actual knowledge or knowledge fairly implied on the basis of objective circumstances" that the act was unfair or deceptive and was prohibited by the FDCPA. 15 U.S.C. § 45(m)(1)(A). "Whether a defendant has violated a rule with actual or implied knowledge is based on objective factors. A defendant is responsible where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision." *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996).

The summary judgment record establishes that Ford was the sole owner and President of CRS up until November 2013. He received daily updates on the company and represented the company in negotiations with government investigations. Ford himself removed David Devany from his role

as Vice President. Thus, Ford had the authority to control the company's collection practices. Therefore, Ford is liable for civil penalties for FDCPA violations by CRS.

In determining the appropriate civil penalty, the Court must take into account the factors listed at 15 U.S.C. § 45(m)(1)(C), which include the degree of culpability, history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require. 15 U.S.C. § 45(m)(1)(C); *see also FTC v. Hughes*, 710 F. Supp. 1524, 1529 (N.D. Tex. 1989). The "other matters" many courts consider include injury to the public and the benefits derived from the violations. *See, e.g. Nat'l Fin. Servs. Inc.*, 98 F.3d at 140. The government has propounded discovery requests to Ford, seeking documents that would prove the two individual defendants' ability to pay civil penalties. Because the government requires that information to provide the Court with the necessary information to consider penalties, the appropriate civil penalty will have to be determined at trial.

## CONCLUSION

It is therefore **ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt. #30) is hereby **GRANTED** as to Defendants Commercial Recovery Systems, Inc. and Timothy Ford. The motion should remain pending as to Defendant Devany. The Court finds Defendants CRS and Ford liable for violations of Section 5 of the FTC Act, 15 U.S.C. §45(a), and multiple provisions of the FDCPA, 15 U.S.C. §§ 1692-1692l, and finds defendant Ford personally liable for civil penalties in an amount to be determined at trial. Plaintiff is directed to submit a proposed order of permanent injunction, to be applicable to CRS and Ford, for the Court's consideration within seven (7) days of this Memorandum Opinion and Order

**SIGNED this 7th day of April, 2016.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE